IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STARR INDEMNITY & LIABILITY CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16-cv-09553 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| TECHNOLOGY INSURANCE CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Starr Indemnity & Liability Co. ("Starr"), an insurance company, provided workers' compensation insurance covering the general contractor and all subcontractors on a construction project in downtown Chicago ("Project"). In December 2014, four ironworkers employed by subcontractor Midwest Steel, Inc. ("Midwest") sustained injuries while working on the Project. Starr paid the injured ironworkers' workers' compensation benefits but claims that Defendant Technology Insurance Co., Inc. ("TIC") was also obligated to insure those workers. Specifically, Starr contends that TIC was a coinsurer with respect to the injured ironworkers' claims because it provided workers' compensation insurance to Administrative Employer Services, Inc. ("AES"), which co-employed the ironworkers along with Midwest. As a result, Starr has brought the present equitable contribution action against TIC, seeking to recover fifty percent of the amount Starr paid to cover the injured ironworkers' workers' compensation claims. Starr now moves for summary judgment, requesting that the Court find as a matter of law that AES was a co-employer of the injured ironworkers, thereby making TIC a coinsurer of their claims. (Dkt. No. 95.) TIC has filed a cross-motion for summary judgment on Starr's claims

against it. (Dkt. No. 101.) For the reasons that follow, Starr's motion is denied and TIC's motion is granted.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed.

### I. Relationship Between Midwest and AES

Midwest is a steel erection construction company. (Pl.'s Resp. to Def.'s Statement of Material Facts ("PRDSMF") ¶ 5, Dkt. No. 113.) From 2009 through at least October 2018, Midwest was a client of AES, a Professional Employer Organization ("PEO"). (*Id.* ¶¶ 4–5.) As a PEO, AES provided human resource services to its clients. (*Id.* ¶ 4.) In particular, AES provided services to Midwest, such as processing payroll, remitting federal and state withholding taxes, remitting union dues for Midwest's union employees, and preparing tax Form W-2s. (*Id.* ¶ 6.) At all times relevant to this action, AES received workers' compensation insurance under a policy issued by TIC. (*Id.* ¶ 3.)

The client service agreement that AES and Midwest entered into in January 2010 ("2010 CSA") provided that AES was the co-employer of Midwest's employees "for the administrative and personnel purposes set forth in" the agreement. (Def.'s Resp. to Pl.'s Statement of Uncontroverted Facts ("DRPSUF") ¶¶ 15–16, Dkt. No. 114.) Further, the 2010 CSA gave AES "the right and authority to implement and supervise AES policies and procedures relating to" the covered Midwest employees. (*Id.* ¶ 16.) Midwest agreed to "cooperate and assist AES in the implementation and supervision of all such policies and procedures" and "[a]ll personnel policies and directives [were to] be made with the approval of AES." (*Id.*) In addition, the 2010 CSA gave AES "the ultimate authority and control over hiring, evaluating, supervising, disciplining and firing" Midwest's employees, and Midwest agreed "not to terminate any Covered Employee

2

without the prior consent of AES." (*Id.*) However, Midwest agreed to "maintain primary responsibility over the day to day work activities and productivity, working conditions, selection . . . of employment candidates, on site management of personnel policies and directives, scheduling and compensation levels of Covered Employees." (*Id.*) Finally, the 2010 CSA required AES to "furnish and keep in full force and effect at all times during the term of this Agreement, Workers' Compensation Insurance covering all of AES employees assigned to" Midwest. (*Id.*)

On January 14, 2015, following the events giving rise to the workers' compensation insurance claims at the center of this action, AES and Midwest entered into a modified client service agreement ("2015 CSA"). (PRDSMF ¶¶ 29–30; DRPSUF ¶ 17.) The purpose of the 2015 CSA was to correct the 2010 CSA, which Midwest and AES believed did not accurately reflect their actual business relationship. (*Id.*) To aid in that purpose, the 2015 CSA declared that it should be deemed retroactively effective as of January 1, 2010. (PRDSMF ¶ 30.) Among the corrections made in the 2015 CSA to reflect Midwest and AES's actual business relationship was the elimination of language requiring AES to obtain workers' compensation insurance for Midwest. (PRDSMF ¶ 30; DRPSUF ¶ 18.) That modification accurately reflected Midwest and AES's practice prior to the execution of the 2015 CSA, as they never complied with or enforced the workers' compensation insurance language in the 2010 CSA. (PRDSMF ¶¶ 17–18.)

Indeed, although AES obtained workers' compensation insurance for itself from TIC, Midwest purchased its own workers' compensation insurance policy from Amerisure Mutual Insurance Company. (*Id.* ¶¶ 3, 10–12.) The 2015 CSA contained language explicitly recognizing their actual practice, stating that "AES has never obtained or maintained Workers'-Compensation insurance for Covered Employees of [Midwest] under this Agreement." (*Id.* ¶ 31.) Rather, Midwest "has at all times under this Agreement made different arrangements for the provision of

3

Workers'-Compensation insurance to cover the Covered Workers, and has never looked to AES to obtain or maintain such Workers'-Compensation Insurance as part of its obligations under this Agreement." (*Id.* ¶ 31.)

In addition, the 2015 CSA sought to clarify AES's rights and responsibilities with respect to Midwest's employees. (PRDSMF ¶¶ 30–31; DRPSUF ¶¶ 17–18.) Specifically, the 2015 CSA stated that Midwest had "the ultimate authority and control over recruiting, hiring, evaluating, supervising, disciplining, and firing of Covered Employees." (DRPSUF ¶ 18.) It also contained language clarifying that since January 1, 2010, Midwest "ha[d] at all times maintained control over decisions relating to hiring, evaluation, supervision, discipline, and firing of all Covered Employees under this Agreement, and AES has not exercised any control over such matters." (PRDSMF ¶ 31.) And like the 2010 CSA, the 2015 CSA also gave Midwest "primary responsibility over the day-to-day work activities and productivity, working conditions, selection . . . of employment candidates, onsite management of personnel policies and directives, scheduling and compensation levels of Covered Employees." (DRPSUF ¶ 18; *see also* PRDSMF ¶ 30.) At the same time, the 2015 CSA continued to identify AES as a co-employer with the "right and authority to implement and supervise AES personnel policies and procedures relating to the" covered employees. (DRPSUF ¶¶ 18.)

## II. Events Giving Rise to Starr's Claims

On December 29, 2014, four ironworkers were injured while working on the Project. (PRDSMF ¶¶ 19, 28; DRPSUF ¶ 19.) Lend Lease (US) Construction, Inc. ("Lend Lease") was the general contractor on the Project. (PRDSMF ¶ 26.) At least for purposes of the Project, the injured ironworkers were employees of Midwest, which was a steel erection subcontractor on the Project. (*Id.* ¶¶ 5, 19.)

4

As a result of the injuries they sustained while working on the Project, the ironworkers applied for workers' compensation benefits with the Illinois Workers' Compensation Commission. (DRPSUF ¶¶ 20–21.) Each of the injured ironworkers' claims was covered by a workers' compensation insurance policy that Starr issued to Lend Lease through the Contractor Controlled Insurance Program that Lend Lease had set up to provide workers' compensation insurance for construction workers on the Project. (PRDSMF ¶ 26; DRPSUF ¶ 10.) Lend Lease required all subcontractors on the Project, including Midwest, to enroll in the Contractor Controlled Insurance Program and be insured under Starr's policy. (PRDSMF ¶ 27; DRPSUF ¶ 11.)

In their applications for workers' compensation benefits, each of the ironworkers identified two entities as their employer: Midwest and AES. (DRPSUF ¶ 21.) Thus, a senior claims analyst with a company Starr retained to administer the ironworkers' claims requested that Midwest's chief financial officer, Kenton Crismore, provide a notarized statement confirming that the ironworkers were Midwest employees. (*Id.* ¶ 22–23.) Crismore replied on January 7, 2015 with a notarized letter stating that at the time of the accident, Midwest was the injured ironworkers' employer under a co-employer relationship with AES. (DRPSUF ¶ 24; Aff. of Kurt D. Baer in Supp. of Pl.'s Mot. for Summ. J. ("Baer Aff."), Ex. 8, Dkt. No. 99-1.) Along with Crismore, the letter was also signed by a representative of AES, Amy Adams. (Baer Aff., Ex. 8.)[1]

After receiving the January 7 letter from Crismore and Adams, Starr denied coverage for the ironworkers' claims based on the letter's representation that AES had a co-employer

---

[1] TIC denies Starr's representation that "Crismore and Amy Adams on behalf of AES sent" the notarized letter, stating that Crismore's testimony establishes that only he sent the letter. (DRPSUF ¶ 24.) But the letter itself clearly bears Amy Adams's signature and the signature line affiliates her with AES. (Baer Aff., Ex. 8.) Thus, whether or not Adams prepared or delivered the letter, it is clear she signed off on the representations contained therein on behalf of AES.

5

relationship with Midwest. (Pl.'s Resp. to Def.'s Statement of Additional Facts ("PRDSAF") ¶ 29, Dkt. No. 138; Baer Aff., Ex. 12 at 262, Dkt. No. 99-1.) Starr contended that because AES had agreed in the 2010 CSA to furnish workers' compensation insurance covering Midwest's employees and was not enrolled in Lend Lease's Contractor Controlled Insurance Program, the ironworkers' claims would have to be filed with AES's workers' compensation insurer. (Baer Aff., Ex. 12 at 262.) Midwest protested the denial, arguing that Midwest was the ironworkers' true employer and that AES simply handled Midwest's payroll and had never provided workers' compensation insurance for Midwest's employees. (PRDSAF ¶ 30.) Ultimately, Starr agreed to cover the injured ironworkers' claims but reserved its right to later seek indemnification or contribution from AES's workers' compensation insurer. (DRPSUF ¶ 30; Baer Aff., Ex. 9, Dkt. No. 99-1.)[2] In total, Starr paid $583,045.18 to cover the injured ironworkers' claims. (DRPSUF ¶ 31.)

### III. Injured Ironworkers' Relationship with Midwest and AES

All Midwest employees working on the Project, including the injured ironworkers, were members of Chicago Iron Workers Union Local 1 ("Local 1") and were hired by Midwest to work on the Project through Local 1. (PRDSMF ¶ 20; DRPSUF ¶¶ 25–26.) At the beginning of the Project, Midwest and Lend Lease gave the employees safety orientations. (PRDSAF ¶ 24.) Midwest had control over the work performed by its employees on the Project and each of the injured ironworkers was supervised by a Midwest employee. (PRDSMF ¶ 22; DRPSUF ¶ 27;

---

[2] TIC denies that Starr accepted the injured ironworkers' claims subject to a reservation of rights. (DRPSUF ¶ 30.) Starr, however, supports its statement of fact with a letter from its claims administrator. (Baer Aff., Ex. 9.) On the other hand, TIC's denial is unsupported. Because TIC fails to provide evidentiary support for its denial, Starr's statement is deemed admitted. N.D. Ill. L.R. 56.1; *see also Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) ("A litigant who denies a material fact is required to provide the admissible evidence that supports his denial in a clear, concise, and obvious fashion, for quick reference of the court.").

6

PRDSAF ¶ 25.) While its employees primarily used their own tools, Midwest did provide them with safety equipment. (PRDSMF ¶ 23; DRPSUF ¶ 29.)

On the other hand, AES was not a subcontractor on the Project and never visited the worksite. (PRDSMF ¶¶ 24.) AES had no involvement in hiring, training, or supervising the injured ironworkers or any other Midwest employee working on the Project. (*Id.* ¶ 25.) Nor did AES supply Midwest's employees with uniforms or tools. (*Id.* ¶ 23.) Instead, AES's involvement with Midwest's employees was limited to providing human resource services. (*Id.* ¶¶ 6, 24–25.) One of AES's main duties was payroll administration. (*Id.* ¶ 6.) To administer Midwest's payroll, AES would receive the employees' weekly timesheets from their supervisors and import that information into an electronic payroll system. (*Id.* ¶ 8.) AES would then use that system to calculate the employees' salary and make payroll deductions. (*Id.*) Finally, it would quality control the payroll. (*Id.*) The checks printed and issued to the employees bore AES's name and logo. (*Id.* ¶ 9.) And while the checks were drawn on AES's account, the money to cover those checks was deducted from Midwest's account and placed into AES's account. (*Id.*)

### IV. Procedural History

Starr initially filed the present action in Illinois state court, and it was removed to this Court on October 6, 2016. (Dkt. No. 1.) While the complaint asserts claims against TIC and AES, this Court dismissed the claims against AES as well as an alternative claim against TIC under the Illinois Workers' Compensation Act, 820 ILCS 305/1(a)(3). (Dkt. Nos. 40–41.) The claims remaining before this Court are Starr's claims for equitable contribution and declaratory judgment. Both claims revolve around Starr's purported right to seek contribution from TIC for payments Starr made with respect to the injured ironworkers' workers' compensation claims. Starr claims it has a right to contribution from TIC because TIC issued a workers' compensation

7

insurance policy to the injured ironworkers' co-employer, AES. Thus, according to Starr, TIC was a coinsurer with respect to the injured ironworkers' claims.

The parties previously filed cross-motions for partial summary judgment seeking a ruling on whether Starr, if it prevailed on its equitable contribution claim, could recover from TIC its share of the entire amount Starr paid to cover the injured ironworkers' claims, even though $500,000 of that sum had been reimbursed to Starr pursuant to the policy's deductible provision. (Dkt. Nos. 59, 72.) The Court granted partial summary judgment in favor of TIC on that issue, holding that Starr cannot include the $500,000 deductible amount in its claim for equitable contribution. (Dkt. Nos. 91–92.) Instead, any recovery Starr receives will be limited to the amounts it paid above the deductible, or one half of $83,045.18.[3] Now, the parties have filed cross-motions for summary judgment addressed to the merits of Starr's claims. (Dkt. Nos. 95, 101.)

## DISCUSSION

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). In evaluating cross-motions for summary judgment, the Court must take "the facts in the light most favorable to the non-movant, first for one side and then for the other." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150, AFL-CIO*, 335 F.3d 643, 648 (7th Cir. 2003).

---

[3] Starr claims that the total amount it paid in relation to the injured ironworkers' claims is $625,848.21. (Baer Aff., Ex. 14, Dkt. No. 99-1.) Therefore, if it prevails on its equitable contribution claim, it will be entitled to one half of the portion of that sum exceeding $500,000, or $62,924.10.

8

Starr's motion is solely directed at the co-employer issue. It asks this Court to find that Midwest and AES were both employers of the injured ironworkers, thereby making their respective workers' compensation insurers, Starr and TIC, coinsurers with respect to the ironworkers' workers' compensation claims. According to Starr, a ruling in its favor on the co-employer issue would establish its entitlement to equitable contribution from TIC for TIC's share of the unreimbursed benefits that Starr paid on behalf of the injured ironworkers. For its part, TIC also seeks summary judgment in its favor on the co-employer issue, asking the Court to rule that AES was not an employer of the injured ironworkers and therefore TIC was not a coinsurer for their workers' compensation claims. But even if AES were a co-employer, TIC argues that the workers' compensation insurance policy it issued to AES did not cover the Project or the injured ironworkers and therefore TIC was under no obligation to cover the injured ironworkers' claims. The Court first addresses the co-employer issue because both parties' motions seek a ruling on that issue. Moreover, the scope-of-coverage issue need only be addressed if AES is found to be the injured ironworkers' co-employer.

Under Illinois law, "[c]ontribution as it pertains to insurance law is an equitable principle arising among coinsurers which permits one insurer who has paid the entire loss, or greater than its share of the loss, to be reimbursed from other insurers who are also liable for the same loss." *Home Ins. Co. v. Cincinnati Ins. Co.*, 821 N.E.2d 269, 276 (Ill. 2004). An insurer bringing an equitable contribution claim must prove: "(1) all facts necessary to the claimant's recovery against the insured; (2) the reasonableness of the amount paid to the insured; and (3) an identity between the policies as to parties and insurable interests and risks." *Schal Bovis, Inc. v. Cas. Ins. Co.*, 732 N.E.2d 1179, 1186 (Ill. App. Ct. 2000). Here, the parties dispute the third element: whether the workers' compensation insurance policy TIC issued to AES covers the same parties as Starr's

9

policy. Specifically, Starr argues that AES should be deemed the injured ironworkers' co-employer thereby establishing that TIC's policy insured the injuries they sustained while working on the Project.

The parties disagree on how the Court should determine whether AES had an employment relationship with the injured ironworkers. According to Starr, the Court need only consult the 2010 and 2015 CSAs to find that AES was an employer. That is because both documents explicitly identified AES as a "co-employer" of Midwest's employees and gave AES substantial responsibility over administrative and personnel matters. TIC contends, however, that Illinois common law governs the determination of AES's status as a co-employer, and that inquiry requires the Court to look to Midwest and AES's actual business relationship.

Since Starr is neither a party to nor a beneficiary of the 2010 and 2015 CSAs (and does not claim to be), finding a co-employer relationship between Midwest and AES is not a straightforward matter of interpreting and enforcing those contracts. Moreover, the Court does not find the contracts' designation of AES as a co-employer particularly instructive. As best the Court can tell, the term "co-employer" does not have any set legal meaning or effect under Illinois law. Rather, the term appears in the 2010 and 2015 CSAs because of specific requirements of Michigan law, which governs those contracts. (*See* Baer Aff., Exs. 4–5, Dkt. No. 99-1.)

As a licensed Michigan PEO, AES is subject to the Michigan Professional Employer Organization Regulatory Act ("PEO Act"), Mich. Comp. Laws § 338.3721 *et seq.* (*See* Suppl. Aff. of Kurt Baer, Ex. 1, Dkt. No. 112-1.) The terms "coemployer" and "coemployment relationship" have defined meanings under the PEO Act. Namely, a "'Coemployer' means either a PEO or a client" and a "'Coemployment relationship' means a relationship that is intended to be an ongoing relationship rather than a temporary or a project-specific one, wherein the rights,

10

duties, and obligations of an employer arising out of an employment relationship have been allocated between coemployers pursuant to a professional employer agreement." Mich. Comp. Laws § 338.3723(b), (c). Moreover, the PEO Act makes clear that it does not "affect, modify, or amend . . . the rights or obligations of any client, PEO, or covered employee under any state or federal act." *Id.* § 338.3725(1); *see also Kuhn v. Healthcare Info., LLC*, No. 13-cv-12652, 2014 WL 3865173, at *1 (E.D. Mich. Aug. 6, 2014) (explaining that a company registered as a PEO in some states but not in Michigan "does not act as the co-employer of any of its clients' Michigan-based employees"). In short, the use of the term co-employer in the 2010 and 2015 CSAs (and in the January 7 letter signed by Crismore and Adams) is not necessarily indicative of an employment relationship between Midwest and AES under Illinois law. *See LM Ins. Corp. v. B&R Ins. Partners*, 68 N.E.3d 499, 506 (Ill. App. Ct. 2016) (finding that the legal effect of a PEO's undisputed contractual co-employer relationship was unsettled as related to employer liability with respect to workers' compensation claimants).

Starr relies on a New York state court case, *Matter of Crespo v. State of New York*, 41 Misc. 3d 807 (N.Y. Ct. Cl. 2013), in support of its contention that a PEO and its client are both employers for purposes of workers' compensation claims, regardless of which employer actually directs and controls the employees' work. However, New York's statute governing PEOs expressly provides that "[b]oth the client and the professional employer organization shall be considered the employer for purposes of coverage under the workers' compensation law." *Id.* at 809 (citing N.Y. Lab. Law § 922(4)). Thus, so long as there is a valid PEO agreement in place between the PEO and its client, the PEO is considered an employer for workers' compensation purposes. *Id.* at 816. There is no similar provision in Michigan's PEO Act, and even if there were, as discussed above, the Court does not believe such a statute would be determinative of AES's

11

employer status in this action under Illinois law. And because the issue before the *Crespo* court "boil[ed] down entirely to the question of whether [N.Y. Lab. Law Section 922(4)] appropriately govern[ed]" the case, the Court finds it inapposite to the circumstances here. *Id.* at 813.

Thus, the Court agrees with TIC that it should look to Illinois common law to determine whether AES can be deemed an employer in the workers' compensation insurance context. That question is "one of the most vexatious in the law of compensation" given the "fact-specific nature of the inquiry." *Kay v. Centegra Health Sys.*, 40 N.E.3d 152, 155 (Ill. App. Ct. 2015) (internal quotation marks omitted). Here, because Starr asserts that Midwest and AES were both employers of the injured ironworkers, the relevant inquiry is whether they were joint employers. *See Freeman v. Augustine's Inc.*, 360 N.E.2d 1245, 1247 (Ill. App. Ct. 1977). To determine the existence of a joint employment relationship, a court should consider the following factors: "(1) who has the right to control an individual; (2) who controls the manner in which the work is performed; (3) the method of payment; (4) who has the right to discharge; and (5) who furnishes the tools, materials, and equipment." *Dildine v. Hunt Transp., Inc.*, 553 N.E.2d 801, 803 (Ill. App. Ct. 1990). "While no single factor is dispositive, the most important single factor is the right to control the work." *Kay*, 40 N.E.3d at 156; *see also Roberson v. Indus. Comm'n*, 866 N.E.2d 191, 200 (Ill. 2007) ("The right to control the manner of the work is often called the most important consideration."). Put simply, two employers will be found to be joint employers with respect to an employee where they share control of the employee and both benefit from the work. *Schmidt v. Milburn Bros., Inc.* 694 N.E.2d 624, 628 (Ill. App. Ct. 1998). In addition, in cases involving two private, independently organized entities, "the trier of fact must also consider the separate corporate existence of each." *Id.*

Before undertaking the joint-employer inquiry, the Court addresses Starr and TIC's dispute as to the weight to be afforded the 2010 and 2015 CSAs as opposed to Midwest and AES's actual business relationship. Multiple Illinois courts have found that a written contract is not conclusive of an employer-employee relationship. *Davila v. Yellow Cab Co.*, 776 N.E.2d 720, 723 (Ill. App. Ct. 2002); *Earley v. Indus. Comm'n*, 553 N.E.2d 1112, 1118 (Ill. App. Ct. 1990); *Tansey v. Robinson*, 164 N.E.2d 272, 275 (Ill. App. Ct. 1960). Instead, the existence of an employer-employee relationship "depends upon the actual practices followed by the parties." *Davila*, 776 N.E.2d at 723 (quoting *Tansey*, 164 N.E.2d at 275). Given the fact-intensive nature of the inquiry, it cannot simply be an exercise of matching contractual provisions to the five joint-employment factors. While a contract can provide useful evidence of a putative employer's rights—for example, its rights to control and discharge employees—evidence of whether the employer actually exercises those rights is the best evidence with respect to those factors. *See Earley*, 553 N.E.2d at 1118 ("[A]lthough a contractual agreement is a factor to consider, it does not, as a matter of law, determine an individual's employment status."); *cf. Bob Neal Pontiac-Toyota, Inc. v. Indus. Comm'n*, 433 N.E.2d 678, 681 (Ill. 1982) ("Although the test is based upon the 'right' to control rather than the exercise of control, evidence of actual control is the best evidence of the parties' understanding of the employer's right of control . . . .").

Looking to Midwest and AES's actual business practices with respect to the injured ironworkers, it is undisputed that AES was not a subcontractor on the Project, did not control the manner in which Midwest's employees performed work on the Project, and never even visited the Project. (PRDSMF ¶ 24.) Nor was it involved in the hiring, training, or supervision of Midwest's employees on the Project. (*Id.* ¶ 25.) And AES did not provide any tools or other materials to the workers. (*Id.* ¶ 23.) By contrast, Midwest hired its employees working on the Project, gave them

13

safety orientations, exercised day-to-day control over their work on the Project, and provided some equipment to them. (PRDSMF ¶¶ 20, 22–23, 25; DRPSUF ¶ 26; PRDSAF ¶¶ 24–25.)

AES's primary involvement with the injured ironworkers and Midwest's other employees was payroll administration. Specifically, AES calculated the employees' weekly salaries, made necessary deductions, and issued and printed the checks. (PRDSMF ¶¶ 6, 8–9.) Moreover, those checks were drawn on AES's bank account and bore AES's name and logo. (*Id.* ¶ 9.) But AES's role in paying Midwest's employees was purely clerical. Midwest was responsible for determining the employees' salary, keeping track of their time, and submitting the relevant information to AES for processing. (*Id.* ¶¶ 8–9.) Most importantly, even though the checks were drawn on AES's account, Midwest immediately reimbursed AES for those payments. (*Id.* ¶ 9.) *See Kay*, 40 N.E.3d at 156 (noting that the identity of the party who paid an employee's salary is a key factor); *Freeman*, 360 N.E.2d at 1248 ("In all of the cases finding that plaintiff was a joint employee, both employers participated in . . . paying the plaintiff . . . .").

Even accounting for the relevant provisions of the 2010 and 2015 CSAs provides Starr little aid. Certainly, there are provisions in one or both agreements that weigh in Starr's favor. For example, the 2010 CSA gave AES the "right and authority to implement and supervise AES policies and procedures" and "the ultimate authority and control over hiring, evaluating, supervising, disciplining and firing" Midwest's employees. (DRPSUF ¶ 16.) However, as discussed above, Midwest does not dispute that AES never exercised that authority—at least with respect to the employees working on the Project. The 2015 CSA further reinforced that during the course of Midwest and AES's business relationship, Midwest "at all times maintained control over decisions relating to hiring, evaluation, supervision, discipline, and firing . . . and AES has

14

not exercised any control over such matters," and revised the inconsistent portions of the 2010 CSA accordingly. (PRDSMF ¶ 31; DRPSUF ¶ 18.)

Reading the 2010 and 2015 CSAs together, the only right of control that AES had with respect to Midwest's employees was the "authority to implement and supervise AES personnel policies and procedures." (DRPSUF ¶ 18.) Viewed in the light most favorable to Starr, AES had some theoretical right to control Midwest's employees. Yet both the 2010 and 2015 CSAs gave Midwest primary responsibility for the onsite management of those personnel policies. (*Id.* ¶¶ 16, 18.) The 2010 and 2015 CSAs together established that Midwest had the ultimate authority to hire, fire, and discipline its employees and primary responsibility for their day-to-day work activities, scheduling, and compensation. (PRDSMF ¶ 31, DRPSUF ¶¶ 16, 18.) Thus, AES's actual exercise of that right with respect to employees on the Project was minimal at best.

Based on both Midwest and AES's actual business relationship as well as the contractual rights of both entities as set forth in the 2010 and 2015 CSAs, all five employment factors weigh in favor of Midwest as the injured ironworkers' sole employer. Indeed, it is undisputed that as to the most important factor, Midwest had the right to control the work performed by its employees on the Project (which it actively exercised) and AES did not.[4] As to another critical factor, the method of payment, while the employees' paychecks were drawn on AES's account, because AES was fully reimbursed by Midwest, the employees' compensation came entirely from Midwest. The only factor that AES comes close to satisfying is the right to control the workers based on its contractual authority to implement and supervise AES personnel policies and

---

[4] Starr contends at points that Local 1 also shared control over the employees' work on the Project. Yet Starr does not argue that Local 1 should be deemed an employer (PRDSAF ¶ 25) or "that the union's role diminished Midwest's functions such that Midwest should not be deemed a co-employer" (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 4, Dkt. No. 111). Whatever the role of Local 1, it does not diminish the fact that Midwest had control over the work performed by its employees on the Project and AES did not.

15

procedures. But, as discussed above, AES exercised that right in a very limited manner and, in practice, Midwest exercised far greater control over its employees. *See Schmidt*, 694 N.E.2d at 629 (ruling as a matter of law against a joint-employment relationship even where the purported joint employer had some degree of control and supervision over another employer's employee). Further weighing against AES's status as a joint employer is its separate corporate existence. *Id.* (finding that defendant's separate corporate identity from the plaintiff's employer weighed against a joint-employer relationship).

Finally, even where two employers share control over an employee, a joint-employer relationship will only be found where both employers benefit from the employee's work. *See Kay*, 40 N.E.3d at 156. Starr argues that AES benefitted from Midwest's employees' work on the Project because it billed Midwest based upon the amount of weekly payroll. However, the benefit an employer derives from its employees' work focuses on the nature of that work and how it furthers the employer's business. *See Roberson*, 866 N.E.2d at 200 ("[W]e have also considered whether the employer's general business encompasses the person's work . . . ."); *Ragler Motor Sales v. Indus. Comm'n*, 442 N.E.2d 903, 905 (Ill. 1982) ("[T]his court has recently attributed increased significance to the nature of the work performed in relation to the general business of the employer."). Thus, as a steel erection company, Midwest benefited from the ironworkers' construction work on the Project because that work directly furthered its business. By contrast, construction work does not directly advance AES's business, which is the provision of human resource services. Because AES's compensation is connected to the amount Midwest pays its employees for their construction work, AES derives a benefit from the fact of the ironworkers' employment. But AES does not benefit from the ironworkers' construction work because it did

16

not advance AES's payroll processing and other human resource duties. Given that lack of benefit, AES cannot be deemed to be a joint employer.

In sum, based on the undisputed evidence, the Court concludes as a matter of law that AES was not the injured ironworkers' employer for purposes of Illinois workers' compensation law. For that reason, AES's workers' compensation insurer, TIC, had no obligation to insure the ironworkers' claims. The Court therefore grants summary judgment in favor of TIC on the equitable contribution and declaratory judgment claims.

## CONCLUSION

For the foregoing reasons, TIC's motion for summary judgment (Dkt. No. 101) is granted and Starr's motion for summary judgment (Dkt. No. 95) is denied. The Clerk will enter Judgment in favor of TIC.

ENTERED:

Dated: May 22, 2020

_____
Andrea R. Wood
United States District Judge